22-2287 All righty, counsel, you may proceed. Are you reserving time? Yes, Your Honour, if I could reserve five minutes. That would be granted. May it please the Court, Alon Kedem on behalf of the Camours Company. All right, okay. Congress enacted the APA based on the belief that better procedures lead to better decision-making. Here, EPA's procedural errors compounded one another to result in an ultra-harsh health advisory level of 10 parts per trillion that is divorced from the record and from basic scientific principles. Since EPA issued the health advisory in June of 2022, Camours has been scrambling to satisfy regulators, permitting authorities, and business partners. The government now says that health advisories are purely informational, but for four decades now, health advisories have been invested with legal and practical consequences by states and EPA itself, and those consequences, which Camours is already experiencing. In this case, the consequences flow from the state's actions, correct? So we have two sets of arguments, one of which is based on state enactments. That's correct. But it's all tied to health advisory levels. So it is still the decision of the EPA that we are counting on. It's an independent decision made by a state to adopt something the EPA has put out as advice, correct? So we dispute that this is just put out as advice. We think from the start EPA had the understanding that this was something that states were enacting into their substantive laws. But if I could take head-on your point that this is the independent actions of third parties, because this is an argument that the government made directly in the Department of Commerce versus New York case. That case involved a challenge to the citizenship question on the census, and New York and a number of other jurisdictions challenged that, saying immigrants are not going to answer the census because they'll be afraid that their answers will be used against them. The government said that is an independent choice made by third parties who are not before the court. It cannot give rise to standing. And the Supreme Court rejected that. What they said is, and I'm now going to quote, third parties will likely react in predictable ways. And we think this is an a fortiori case from Department of Commerce, because we don't have to make a prediction about how third parties are going to react. It's already happening. And let me point you to evidence that we've submitted in the Telfer Declaration, paragraphs 8 and 9. Comores operates facilities in which they produce HFPO dimer acid and use it in manufacturing processes, including in North Carolina. We pointed to a North Carolina statute and a permit that Comores got for its Fayetteville Works facility, and they are based on the health advisory. And I think it's obvious to say that predictable is certainly something that you would say about an automatic consequence of a state law. Aren't you under a consent order with North Carolina? So we are, but that's not the basis for the permit that we are referring to. So this is the permit in paragraph 9 of the Telfer Declaration. Does this have anything to do or should it have anything to do with our standing analysis here? I think it speaks directly to the standing analysis. I'm talking about the consent order. Oh, I see. We're not basing it on standing. We don't think it affects it here. And one notable thing about this permit that I've been referring to, it initially set a far higher and from Comores' perspective, much more feasible standard for Comores to meet. But when the health advisory was issued, they said, we're basing this on the health advisory. And we're not saying that this permit itself gives us standing, but it clearly corroborates the common sense notion that third parties are going to react in fairly predictable ways. So if the court has no further questions about standing. So if we accept your position, is there a distinction to be made between an advisory and a regulation? Or you see them as one and the same? So are you asking for standing purposes or final agency action? Finality. So I think for final agency action, the arguments are slightly different for a regulation as compared to this. I would like to caution the court. I understand that health advisories are characterized by the government as informational. But since the beginning, the government has understood that they have these mandatory effects under state law. And let me just briefly read you something that the government issued in the Federal Register in 1984. States have adopted health advisories as enforceable standards. And consequently, public water systems have been forced to make permanent and costly decisions on the basis of health guidance. So they've always understood that they've had these effects. The finality test has two components. Number one, you have to have a decision of the agency that culminates its decision-making process. There's no dispute that we have that here. You also have to be able to point to consequences. And we think we can point to consequences under federal law that result from the health advisory directly. And the clearest example of this is the Underground Injection Control Program, which is part of the Safe Drinking Water Act itself. It's a major component of it. And basically, it just deals with the disposal of waste. And there are six different classes of it. We're talking about Class 5 waste here, so motor vehicle waste, things like rental car agencies or bus stops, truck stops, or, you know, repair shops, that sort of waste. And if you want to get a permit, which you need to do in order to maintain a Class 5 waste, in Utah, under the Safe Drinking Water Act, you cannot get the permit unless you satisfy health advisories, including now this health advisory. So you have to meet the 10 parts per trillion threshold. Otherwise, you cannot get a permit under the Safe Drinking Water Act. And that is a federal consequence under federal law. And I can't claim to have read every single APA case. You know, the government also obviously knows a lot about the APA. Neither of us have found a single case in which there is an agency decision that leads to a change in the substantive federal standards that has not been held to be final agency action. And just to sort of tie the point off, when I say that it's a substantive federal standard, I mean you can't get a permit, you can't maintain a permit, unless you meet this threshold. It is enforceable, not only by the state, but by EPA itself if the state fails to act. Failure to meet it or to maintain the permit, if you've gotten one, means that you are subject to civil penalties. And in an extreme case, you could even go to federal prison as a result of it. So it has all of these federal features that are, again, tied directly to the health advisory. And if the health advisory were set aside, which is the relief that we're asking, those consequences would go away. So you're telling me that a regulation is the same as an advisory. So it's not the same as an advisory. The statute itself talks about regulations and has certain criteria for what they call maximum. So analysis should run parallel. So I think the final agency action analysis is parallel in the same sort of generality. The consequences that I'm pointing to are slightly different. But, you know, there's also one additional procedural hurdle that you have to jump through if it's a regulation. In addition to all the sort of normal notice and comment obligations, you also have to hold a public hearing, which is something that you don't normally have to do. That's the procedural difference. But as far as final agency action, we think we should establish the same types of consequences. And just on a higher level. No. Maybe this is an inapt hypothetical, but what if the Fed says they hold a hearing and say, yeah, we're going to cut rates, and states say if they do that, we're adjusting something else. Yeah. Does that all of a sudden become a final order of an agency? So I don't think that it does. Well, the Fed's decision to change rates would certainly. Well, but if they're saying we may do this, it seems like we will do this in the future type thing. And then others rely on that, states, and do something different. Sure. Does that mean folks can come to court and challenge that? No, and I think the key difference is you'd fail at the very first step of finality, because in that case you would be challenging a decision of the state that you want to set aside. It would not be a decision culminated at the highest level of an agency that you want to set aside in order to get your relief. That's what we want here. Once the health advisory goes away, it's not the information that it contains that we're concerned about. It's federal legal effects among others. But suppose one state sets up its threshold to the advisory and another state doesn't. Yes. And you're good in state A but not good in state B. What do we do? So I think all you need to point to is some legal consequence. I don't think there's any dispute. Any legal consequence. So I don't think there's any dispute. If EPA itself had just said, in order to get this sort of Safe Drinking Water Act permit in Utah, you have to meet ten parts per trillion, clearly that would be final agency action. So really the only question is whether a different result is warranted here, even though the legal effect is exactly the same. And I know that you're not relying on this for your argument, but what if the legal consequence flowed purely from a consent decree that your client entered in voluntarily? So then I don't think there would be agency action that we could challenge, or at the least I think we'd have a standing problem because it's a self-inflicted problem. Despite the legal consequence. Despite the legal consequences. The Safe Water Act says that a petition for review may be filed after a final action, okay? It seems like you may have changed course between your briefs. At one point I think that you said jurisdiction comes from Section 1331, and then elsewhere you say it's from the Safe Water Drinking Act. Which is it? So I think you could either think of the Safe Drinking Water Act as a jurisdictional provision or as… Well, what's your position on it? So I guess we would say it's just the statutory cause of action. I think the Supreme Court has been relatively clear that they don't want courts treating things as jurisdictional unless the statute itself really clearly indicates it. But it says final order, and your argument, I think, is that this is a final order. Yes. And this court's cases have been very clear that you treat as final orders things that qualify under the APA's final agency action standard. Okay. Anything else? Anything else? Okay. Thank you. We'll hear from you on rebuttal. Now we'll hear from the government. Good morning. May it please the court. Andrew Knutson for respondents to the U.S. Environmental Protection Agency. I'm going to address the jurisdictional issues requiring dismissal of this case, and I'm also prepared to address Comora's procedural and constitutional arguments. My co-counsel, Ms. Kimball, is available to answer any questions on the merits. We had initially proposed a split of time, but in light of the court's letter from Monday night, we are happy to address the issues for whatever time the court would prefer. This case concerns a non-binding report, which the Safe Drinking Water Act. One second. We'll keep the clock running from 15, okay? So maybe we can start it right now. Okay. Thank you. Okay. Thank you. Go ahead. Thank you. This case concerns a non-binding report, which the Safe Drinking Water Act itself says is not a regulation. It was published to inform the public about an emerging contaminant. And agencies publish reports like this all the time, whether it's to provide information about issues of developing concern, such as here, or to warn the public of dangers to public health and safety, like the State Department travel advisories, or simply to provide useful information, like statistics on unemployment rates or inflation rates. Of course, your adversary brings up that this is much different. States adopt these things and rely upon them, and that's, you know, the main basis of one of their arguments. How do you – isn't that a little bit different than some of the things you just cited? It's really not different, Your Honor, because, again, EPA's statement in the health advisory is simply advice. It's right there in the statutory text that this is an advisory, not a regulation. What states independently choose to do with that advice doesn't convert the agency report into final action, and that's really well-trod ground, both in this court and the Supreme Court and other circuits. I mean, in cases like Hines v. FDIC, this court found that a state's reliance on information in an agency report or an agency letter doesn't convert the agency report into final action. So that's the case here, too. I think it's helpful, at first, just to look at the health advisory on its face, which clearly shows that it's not a binding document and only includes non-enforceable scientific information. Comerce has called this the agency's characterization of the document, but I think, again, if the court were to look at the document itself, it's clear that it contains information on exposures to this contaminant, to its toxicity, methods of treatment, and includes the health advisory level that they are focused on here, 10 parts per trillion. And as I mentioned before, the State Drinking Water Act itself includes an explicit disclaimer of any regulatory effect for these kinds of advisory documents. So we're trying to figure out whether legal consequences flow from a health advisory. So I understand Mr. Kedem's argument to be that the advisory itself doesn't have to contain any language about legal consequences. But if there are other statutes that incorporate that advisory, then there are legal consequences. So what's your position on that? Well, I would point to the Supreme Court's decision in Hawks, in U.S. Army Corps of Engineers v. Hawks, which made very clear that the court's finality analysis, even though it may be a pragmatic one, does not look at the second prong to whether there are indirect consequences, that it's specifically focused on direct and appreciable legal consequences from the challenged action itself. No, I mean, in MedImmune, the Supreme Court said that a plaintiff need only establish a genuine threat of enforcement. Isn't there a genuine threat of enforcement by North Carolina? No, there's not, Your Honor. And I'll just point out at the outset that MedImmune is a case about standing, not about finality. But even there on the issue of standing, there's no genuine threat of enforcement, largely because of the consent decree that Comoros has discussed earlier. That consent decree, although it wasn't brought under the North Carolina statute that Comoros has identified in its brief, actually includes a waiver of the state's ability to pursue an enforcement action under that statute against Comoros for its Fayetteville facility. That's in paragraph 34 of that consent decree. So the state can't pursue an enforcement action against Comoros' Fayetteville facility, and Comoros hasn't identified any other facilities it has in the state that could instead be the focus of any enforcement action. What's your response to the point that your friend made about the underground injection law being a federal statute that brings about legal consequences from this advisory? So we have a few responses on that point. The first is that it's not a federal requirement. Under the Safe Drinking Water Act program, EPA can recognize what's called state primacy over certain areas if the state's program meets certain criteria. But the state's requirements are still requirements of state law. They're not federal law. And second to that, again, this is not something that the Safe Drinking Water Act or EPA's regulations require Utah to do. Utah is apparently the only state, or at least that any of the parties here have identified, that has chosen to adopt health advisories as a requirement for one small category of sources that apparently cannot even be built anymore because it's limited to existing sources built before a point in the early 2000s. And even for those sources, to the extent there is any legal consequence requiring a permittee to comply with the health advisory, that solely comes from the state of Utah's independent decision making, which again the Supreme Court and this Court have held breaks the chain of causation that makes these legal consequences indirect rather than direct for purposes of the finality analysis. Regarding finality, has the EPA ever rejected or modified a health advisory when issuing, I guess, a relevant regulation? In other words, do health advisories, well, do health advisories serve as a basis for regulations? No, they don't, Your Honor. First of all, the Safe Drinking Water Act's regulatory program for national drinking water standards operates independently of health advisories. So these are really kind of a separate animal that are not part of the rulemaking process. And EPA doesn't give health advisories or the information in any kind of binding effect in exercising any of its other authorities under the Safe Drinking Water Act. That's true in the rulemaking process where, for example, EPA is currently now in the process of promulgating regulations for several PFAS contaminants, including HFPO here. And as part of that rulemaking, EPA didn't rely on the health advisory in any way as establishing any kind of binding findings or assumptions about the science behind this contaminant or safe exposure levels. Can you just pick up where it left off with the health advisory? No, Your Honor. All the issues that Comoros has raised here, frankly, with the merits of the health advisory, have been open to public comment and will have to be addressed in the final rule and will be subject to judicial review on review of any final rule EPA promulgates. Comoros has also pointed to EPA's authority under Section 1431, which allows it to address imminent and substantial endangerment. And they relied on an EPA guidance document which they say treats health advisory exceedances as a kind of trigger for exercise of that authority. But that relies on a misreading of the guidance, which actually says that exercise of that authority is case-specific and dependent on a number of facts, and that the health advisory exceedance might be relevant information the agency can consider in that process. But it's always dependent on a case-specific finding and consideration of other factors like exposure duration, the affected population, whether any harm is remote in time. And, again, no binding effect is given to the health advisory. Finally, Comoros has made a lot in this case of the fact that the state requirements that adopt health advisories by reference do so preemptively in a way, that they have adopted them by incorporation. But that's really not a distinction that makes a difference for the finality analysis. This court and, again, the Supreme Court and others have all found that what matters is who's the ultimate decider that imposes the legal consequence. And here it doesn't matter whether the states chose to do so proactively before the health advisory is issued for an individual contaminant or do so after the facts. What matters is that the source of those legal requirements is the state decision to impose those requirements itself. That's consistent with the Supreme Court's decision in Dalton v. Specter, a case which involved the closure of the Philadelphian shipyard down the road, where the courts considered a recommendation from a base closure commission on various bases to close. And the president did have the authority to decide whether to order closure of the bases on that list or not order closure of the bases on that list, but couldn't pick and choose among the bases that the commission identified. And the petitioners in that case had argued that the president's discretion was constrained somehow by the fact that he was given an up or down vote on that list. And, again, the Supreme Court clearly decided that what mattered was the fact that it was the president who had the ultimate decision-making authority on the action that actually had direct impacts, which was the closures. If there are no further questions on finality, I'll briefly address standing here. Kimura has said that it's been scrambling to address the health advisory in the level that was spelled out in it, but wasn't clear on who it's scrambling to address that for. Seemingly, they may be referring to the Clean Water Act permit that North Carolina issued. But in their briefs, and I think here, too, they've disclaimed reliance on that for purposes of standing. Again, partially, I think, because it was issued after this case commenced. And they've also disclaimed any reliance on the consent decree they've entered with the state of North Carolina. So, finally, the only potential source of standing would be potential enforcement by the state of North Carolina of the state's statutory provision. The Telford Declaration says that in paragraph 9, I think, essentially. Yes, that's right. And, again, as we mentioned, the state has weighed in the ability to enforce that against the favorable facility in that consent decree in paragraph 34, and, of course, hasn't identified any other appreciable risk or genuine threat of enforcement from that statute. So, is it your position that, with respect to your standing argument, the fact that states might rely on this health advisory has no effect here? Certainly not in Comoros. Comoros certainly hasn't argued that it operates under route injection control, a facility subject to the UIC program in the state of Utah, such that it could potentially be subject to federal enforcement, as they've argued. Okay. We'll hear from your colleague. Thank you. Thank you. Good morning, and may it please the Court. I'm Kimmery Kimball, representing EPA.  The underlying science went through multiple rounds of peer review, in addition to public comment and in-depth discourse with Comoros specifically, all of which EPA fully considered before issuing the advisory. When this Court considers an agency's highly technical and scientific analyses, like EPA's assessment here, this Court's review is at its absolute most deferential. This Court has explained that its only task is to determine whether EPA considered the relevant factors and articulated a rational connection. Here, EPA conducted an extraordinarily thorough analysis of all relevant factors and fully explained its reasoning. At the outset, although Comoros erroneously asserts that EPA was required to consider unidentified costs, analysis of costs has no place in EPA's purely scientific advisory on the health effects of the contaminant. Additionally, although Comoros disagrees with EPA's highly technical scientific assessment on EPA's determination of the relative source contribution, on its analysis of uncertainty factors, and on its reliance on rodent studies, there is extensive evidence in the record to support EPA's conclusions on each of these factors. I'm happy to answer any questions the Court may have about any of the merits of the health advisory. Well, your friend points out that the EPA ignored 22 of their independent reports that show that this HFPO dimer acid really is the only problem through drinking water. I didn't really notice anything in the brief about that. Maybe you can address it. Absolutely. EPA did not ignore those reports. The EPA's analysis of that is in the record at Joint Appendix 1056 through 63 in response to EPA's request for correction. As we explained in a footnote in the brief, the EPA fully considered those documents that were actually relevant to HFPODA and were peer-reviewed, valid scientific studies as required by the Safe Drinking Water Act. A lot of the documents that Comoros submitted were not those things. They were PowerPoint presentations. They were raw data with no explanation of how the data had been collected. They were studies that had not been peer-reviewed, that were purely internal documents. And EPA explained at length that it did not consider those documents because they either are not valid scientific studies that can be considered under the very explicit requirements of the Safe Drinking Water Act, or they weren't related to HFPODA specifically and instead talked about other types of PFAS. EPA fully considered all documents that were actually related to HFPODA and incorporated those into the health advisory. I'd also like to give you a chance to, perhaps I shouldn't have asked your friend, although it dealt with finality about the relationship between one of your health advisories and a regulation. I believe he had said something to the effect of this is two completely different things, and I thought if you want to comment on it, perhaps that's accurate, maybe slightly not accurate, I don't know. But maybe you could tell us. It is accurate. So the underlying science is science that EPA is considering in the rulemaking. And in the Notice of Proposed Rulemaking, they do consider the underlying science, but they don't start with the health advisory level, and they don't use that as a precursor to the regulation. So the toxicity assessment that occurred before the health advisory, that went through all of the rodent studies and discussed the uncertainty factors, that is something that is considered in the rulemaking. But the health advisory itself is not a precursor to the rulemaking, and the health advisory level is not a level that they have to start with at the rulemaking or anything along those lines. Okay. Okay, thank you, Counsel. And we'll hear from your adversary. Thank you, Your Honor. Let's start first with standing. I want to clear up a couple of misunderstandings from my friend. First, we are absolutely relying on the permit that appears at paragraph 9 of the Telfer Declaration to establish standing. Our point was we aren't saying that the permit itself confers standing on Comores. We're just saying the permit is strong evidence that third parties are reacting to the health advisory exactly as you would expect them to, which is the standard that the Supreme Court established in the Department of Commerce case. He also misstates that we're not relying or can't rely on the North Carolina statute cited at paragraph 8 of the Telfer Declaration because there is already this consent order. But the two do not overlap perfectly. The consent order is limited to the Cape Fear Basin. The statute is statewide and affects Comores statewide. Turning to final agency action, first of all, I think the most basic disagreement between us and the government is about whether the standards that Utah imposes under the Safe Drinking Water Act Underground Injection Control Program are federal standards. We absolutely believe that they are. Because of privacy, the standards established by Utah are the Safe Drinking Water Act standards for that program in Utah. There are no others. And if you want to get a Class 5 well, you have to satisfy those standards. And if you fail to do so, or if Utah grants a permit even though you fail to do so, that is a violation of the Safe Drinking Water Act. And it can be enforced not just by Utah itself but by EPA in federal court proceedings that have federal consequences, including high, steep civil fines and being sent to federal prison. If federal consequences means anything, we think that that counts. And I think the contrast between this case and the Dalton case really just drives home why this case is unlike any other cited by the government. In the Dalton case, it was a base closure recommendation that had literally no consequences under federal law whatsoever. If you didn't follow that recommendation, literally nothing happened. Here, if you don't meet 10 parts per trillion in Utah, you cannot get a permit. Or if you have a permit, you are violating your Safe Drinking Water Act obligations and can be penalized under federal law. Your Honor, we are not aware of any other case. And again, we challenged the government in our motion to dismiss. We did it again in our opening briefing and then on rebuttal. The government has not come up with a single case in which there is an agency that makes a decision that has these sorts of federal consequences and can be reversed if you set aside the agency decision. And nevertheless, it was held not to be final agency action. My friend described the health advisory as informational because it says so on its face. Agencies all the time disclaim the finality consequences of their own pronouncements. These courts make an independent judgment for themselves about whether, in fact, they are final. And that is especially true given the fact that EPA itself has known since 1984 in the provision that I just quoted to you, so that's Volume 49 of the Federal Register at pages 24, 353, that these sorts of state standards automatically flow as a result of it. Moreover, EPA issued a press release. There's a reason that they touted this as a major achievement and said that it was, quote, aggressive action to, quote, prevent these chemicals from entering the environment, not because they were purely informational. And if it were purely informational, then COMORS would basically not care whether the health advisory was set aside because the information is still out there. The reason COMORS wants this set aside is because it has immediate practical consequences that are already obtaining for COMORS. I don't have time to go through all the different merits arguments, but I don't think I need to because it's indisputed that here they didn't go through notice and comment. And if this is final agency action, then it's a substantive final agency action that has to go through notice and comment. The only argument to the contrary that the government brings up is that this is a general policy, but it picks a specific number for a specific – But the terms of it allow for changes and all that. Sure. If you read it, it doesn't seem like it's something that is, you know, solid, that's going to be, you know, existing forever or may exist forever. So how do we deal with that? Yeah. So I grant that if you look just to the four corners of the document, they've written it in that way. But you would have to ignore the 40-year history of these documents. You would have to ignore all the existing legal provisions that give it effect both under state and federal law. And that is not something that, respectfully, we think that the court should blind itself to. This is not a case about whether EPA can set a health advisory level for HFPO dimer acid. It's about how they go about doing so. Can the agency set a numerical standard that has immediate practical consequences under state and federal law, knowing this, knowing that it's got this 40-year history of what a health advisory is and what it means to everyone in the community, and turn around and say, well, you can't do anything about it, doesn't matter whether it complies with law or not, you have no rights to even get a hearing in court. Okay. Thank you, counsel. We thank counsel for their – we'll take a case.